# 18-1590(L)

**18-1689(CON)**

*To Be Argued By*:
EMIL J. BOVE III

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 18-1590(L), 18-1689(CON)

➤◆◆◆➤

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JOHN DOE #1, JOHN DOE #2,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA
## [FILED UNDER SEAL]

GEOFFREY S. BERMAN,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

EMIL J. BOVE III,
WON S. SHIN,
*Assistant United States Attorneys,
Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  Doe-1's Drug Trafficking Activities
       in Mexico . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    B.  The Defendants' Work as DEA
       Confidential Sources. . . . . . . . . . . . . . . . . .  4

    C.  The Defendants' Unauthorized Drug
       Trafficking Activities . . . . . . . . . . . . . . . . . .  5

    D.  The Defendants' Guilty Pleas and
       Cooperation Agreements . . . . . . . . . . . . . .  6

    E.  The Defendants' Suppression Hearing
       Testimony in the *Flores* Case. . . . . . . . . . .  7

    F.  Doe-1's Testimony at the *Flores* Trial . . . . .  9

    G.  The Presentence Reports and
       the Sentencing Submissions . . . . . . . . . . .  11

    H.  The Defendants' Sentencings. . . . . . . . . . .  14

ARGUMENT:

POINT I—The District Court Properly Denied
       Doe-2 Safety-Valve Relief . . . . . . . . . . . . . . . . .  17

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  17

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  21

ii

POINT II—The Defendants' Sentences Are
    Substantively Reasonable. . . . . . . . . . . . . . . .  26

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  26

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  28

POINT III—The District Court Did Not Abuse
    Its Discretion in Imposing Fines . . . . . . . . . . .  30

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  30

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  32

        1.  The Defendants Failed to Carry
            Their Burden of Establishing
            Inability to Pay . . . . . . . . . . . . . . . . . .  32

        2.  The Defendants Had an
            Adequate Opportunity to Prove
            Inability to Pay . . . . . . . . . . . . . . . . . .  35

        3.  The District Court Was Not
            Required to Make Particularized
            Findings . . . . . . . . . . . . . . . . . . . . . . . .  38

POINT IV—Defendants' Challenges to Two
    Standard Supervised Release Conditions
    Should Be Denied . . . . . . . . . . . . . . . . . . . . . . .  40

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  41

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  43

PAGE

1. The Challenge to Standard Condition 12 (the Risk Condition) Is Moot . . . . . . . . . . . . . . . . . . . . . . . .  43

2. The District Court Did Not Abuse Its Discretion by Imposing Standard Condition 8 (the Communications Condition) . . . . . . . . . . . . . . . . . . . . . . .  45

   a. The Communications Condition Is Not Vague or Overbroad . . . . . .  45

   b. The Communications Condition Does Not Violate a Constitutional Right to Association . . . . . . . . . . .  48

     i. The Communications Condition Does Not Violate the First Amendment Freedom of Association . . . . . . . . . . . . . .  48

     ii. The Communications Condition Does Not Violate the Due Process Right to Intimate Association . . . . . . . . . . . . . .  50

POINT V—The Court Should Reject in Part and Decline to Hear in Part ███ Ineffective Assistance of Counsel Claim . . . . . . . . . . . . . .  55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

# TABLE OF AUTHORITIES

*Cases:*

*Anderson v. City of Bessemer City,*
 470 U.S. 564 (1985). . . . . . . . . . . . . . . . . . . . . . . . 20

*Arciniega v. Freeman,*
 404 U.S. 4 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Birzon v. King,*
 469 F.2d 1241 (2d Cir. 1972) . . . . . .  46, 49, 50, 51

*Gall v. United States,*
 552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . 26

*Gorman v. Rensselaer County,*
 910 F.3d 40 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 51

*In re Vacatur of Standard Condition of*
 *Supervision Pertaining to Third Party Risk,*
 No. 19 Misc. 218 (S.D.N.Y. Apr. 25, 2019) . . . . . 44

*Johnson v. United States,*
 529 U.S. 694 (2000). . . . . . . . . . . . . . . . . . . . . . . . 48

*Massaro v. United States,*
 538 U.S. 500 (2003). . . . . . . . . . . . . . . . . . . . . . . . 56

*Mont v. United States,*
 139 S. Ct. 1826 (2019). . . . . . . . . . . . . . . . . . . . . . 48

*Posters 'N' Things, Ltd. v. United States,*
 511 U.S. 513 (1994). . . . . . . . . . . . . . . . . . . . . . . . 46

*Puckett v. United States,*
 556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . . . 43

*Sanitation & Recycling Industry, Inc. v.*
    *City of New York*,
    107 F.3d 985 (2d Cir. 1997) . . . . . . . . . . . . . 52, 53

*United States v. Albanese*,
    554 F.2d 543 (2d Cir. 1977) . . . . . . . . . . . . . 49, 52

*United States v. Aregbeyen*,
    251 F.3d 337 (2d Cir. 2001) . . . . . . . . . . . . . . . 38

*United States v. Asuncion-Pimentel*,
    290 F.3d 91 (2d Cir. 2002) . . . . . . . . . . . . . . . . 42

*United States v. Bohn*,
    959 F.2d 389 (2d Cir. 1992) . . . . . . . . . . . . . . . 40

*United States v. Boles*,
    914 F.3d 95 (2d Cir. 2019) . . . . . . . . . . . . . . . . 44

*United States v. Brown*,
    402 F.3d 133 (2d Cir. 2005) . . . . . . . . . . . . . . . 41

*United States v. Broxmeyer*,
    699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . 26, 27, 29

*United States v. Campo Flores*,
    No. 15 Cr. 765 (PAC), 2016 WL 5946472
    (S.D.N.Y. Oct. 12, 2016) . . . . . . . . . . . . . . . . 5, 7

*United States v. Campo Flores*,
    No. 15 Cr. 765 (PAC), 2017 WL 1133430
    (S.D.N.Y. Mar. 24, 2017) . . . . . . . . . . . . 5, 10, 53

*United States v. Carlton*,
    442 F.3d 802 (2d Cir. 2006) . . . . . . . . . . . . . . . 49

PAGE

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) . . . . . . . 26, 30, 31, 32

*United States v. Cho,*
    713 F.3d 716 (2d Cir. 2013) . . . . . . . . . . . . . . . . 20

*United States v. Conde,*
    178 F.3d 616 (2d Cir. 1999) . . . . . . . . . . 18, 19, 23

*United States v. Corace,*
    146 F.3d 51 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 35

*United States v. Cramer,*
    777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . . . . 20

*United States v. Dupes,*
    513 F.3d 338 (2d Cir. 2008) . . . . . . . . . . . . . 42, 43

*United States v. Elfgeeh,*
    515 F.3d 100 (2d Cir. 2008) . . . . . . . 31, 35, 36, 37

*United States v. Fernandez,*
    443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . 27, 29

*United States v. Fields,*
    113 F.3d 313 (2d Cir. 1997) . . . . . . . . . . 31, 33, 34

*United States v. Gambino,*
    106 F.3d 1105 (2d Cir. 1997) . . . . . . . . . . . . . . . 19

*United States v. Gasperini,*
    894 F.3d 482 (2d Cir. 2018) . . . . . . . . . . . . . . . . 20

*United States v. Gill,*
    523 F.3d 107 (2d Cir. 2008) . . . . . . . . . . . . . . . . 42

*United States v. Gracia,*
    755 F.2d 984 (2d Cir. 1985) . . . . . . . . . . 49, 51, 54

PAGE

*United States v. Green,*
618 F.3d 120 (2d Cir. 2010) . . . . . . . . . . . . . . 48, 49

*United States v. Greer,*
285 F.3d 158 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 32

*United States v. Halloran,*
821 F.3d 321 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 30

*United States v. Jacques,*
321 F.3d 255 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 53

*United States v. Jeffers,*
329 F.3d 94 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 24

*United States v. Jimenez,*
451 F.3d 97 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 18

*United States v. Johnson,*
446 F.3d 272 (2d Cir. 2006) . . . . . . . . . . 44, 47, 48

*United States v. Jones,*
460 F.3d 191 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 27

*United States v. Kappes,*
782 F.3d 828 (7th Cir. 2015) . . . . . . . . . 45, 46, 47

*United States v. Khedr,*
343 F.3d 96 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 56

*United States v. Marcus,*
560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . 21, 43

*United States v. Marquez,*
941 F.2d 60 (2d Cir. 1991) . . . . . . . . . . . . . . 38, 39

*United States v. Miller,*
641 F. App'x 563 (7th Cir. 2016) . . . . . . . . . . . . 47

PAGE

*United States v. Morris,*
    350 F.3d 32 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 56

*United States v. Murray,*
    275 U.S. 347 (1928). . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Myers,*
    426 F.3d 117 (2d Cir. 2005) . . . . . . . . . . . . . . 51, 52

*United States v. Nuzzo,*
    385 F.3d 109 (2d Cir. 2004) . . . . . . . . . .  19, 20, 24

*United States v. Orena,*
    32 F.3d 704 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 33

*United States v. Ortiz,*
    136 F.3d 882 (2d Cir. 1997) . . . . . . . . . . . . . 19, 20

*United States v. Pabon,*
    819 F.3d 26 (1st Cir. 2016). . . . . . . . . . . . . . . . . 48

*United States v. Perez-Frias,*
    636 F.3d 39 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 29

*United States v. Pope,*
    554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 27

*United States v. Rattoballi,*
    452 F.3d 127 (2d Cir. 2006) . . . . . . . . . . . . . . . . 31

*United States v. Reeves,*
    591 F.3d 77 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 51

*United States v. Reynoso,*
    239 F.3d 143 (2d Cir. 2000) . . . . . . . . . . . . . . . . 19

*United States v. Rigas,*
    583 F.3d 108 (2d Cir. 2009) . . . . . . . . . . . . . . . . 27

*United States v. Rivera,*
    971 F.2d 876 (2d Cir. 1992) . . . . . . . . . . . . . . . . . 33

*United States v. Rivernider,*
    828 F.3d 91 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 29

*United States v. Rosario,*
    386 F.3d 166 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 40

*United States v. Salameh,*
    261 F.3d 271 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 31

*United States v. Sasso,*
    59 F.3d 341 (2d Cir. 1995) . . . . . . . . . . . 34, 35, 38

*United States v. Schiff,*
    876 F.2d 272 (2d Cir. 1989) . . . . . . . . . . . . . . . . . 50

*United States v. Schreiber,*
    191 F.3d 103 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 24

*United States v. Smith,*
    982 F.2d 757 (2d Cir. 1992) . . . . . . . . . . . . . . . . . 42

*United States v. Svoboda,*
    347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 55

*United States v. Tanaka,*
    644 F. App'x 36 (2d Cir. 2016) . . . . . . . . . . . . . . 33

*United States v. Thompson,*
    227 F.3d 43 (2d Cir. 2000) . . . . . . . . . . . . . . . 33, 39

*United States v. Thompson,*
    777 F.3d 368 (7th Cir. 2015) . . . . . . . . . 45, 46, 47

*United States v. Tocco,*
    135 F.3d 116 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 38

x

PAGE

*United States v. Tolla,*
  781 F.2d 29 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . 52

*United States v. Truscello,*
  168 F.3d 61 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 42

*United States v. Ulbricht,*
  858 F.3d 71 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . 20

*United States v. Versaglio,*
  85 F.3d 943 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . 40

*United States v. Walker,*
  262 F. App'x 303 (2d Cir. 2008) . . . . . . . . . . . . . 33

*United States v. Whab,*
  355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . . 54

*United States v. Young,*
  932 F.2d 1035 (2d Cir. 1991) . . . . . . . . . . . . . . . 40

*United States v. Zukerman,*
  897 F.3d 423 (2d Cir. 2018) . . . . . . . . . . . . . . . . 31

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . .  18, 25, 39

18 U.S.C. § 3572 . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38

18 U.S.C. § 3583 . . . . . . . . . . . . . . . . . . . . . . . . . 41, 54

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 55

21 U.S.C. § 960 . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 55

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

PAGE

First Step Act of 2018,
   Pub. L. No. 115-391, 132 Stat. 5194 . . . . . . . . . . 18

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. § 2D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S.S.G. § 5C1.2 . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

U.S.S.G. § 5D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

U.S.S.G. § 5D1.3 . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 5E1.2 . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

U.S.S.G. App. C, amend. 803 (eff. Nov. 1, 2016) . . . 47

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 18-1590(L), 18-1689(CON)

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JOHN DOE #1, JOHN DOE #2,

*Defendants-Appellants.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

John Doe-1 ("Doe-1") and John Doe-2 ("Doe-2") appeal from judgments of conviction entered on May 15, 2018 in the United States District Court for the Southern District of New York, by the Honorable Paul A. Crotty, United States District Judge, following their guilty pleas.

Information 16 Cr. 588 (PAC) (the "Information") was filed on September 1, 2016, in three counts. Count One charged Doe-1 with conspiring to import controlled substances into the United States, and to manufacture and distribute controlled substances, know-

ing and intending that they would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 963, 952, 959, and 960(b)(1). Count Two charged Doe-1 with conspiring to distribute, and to possess with intent to distribute, controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Count Three charged Doe-1 with concealing material facts in a matter within the jurisdiction of the Drug Enforcement Administration, in violation of 18 U.S.C. § 1001(a)(1).

That same day, Doe-1 pleaded guilty to the three counts of the Information, pursuant to a written cooperation agreement with the Government.

Superseding Information S1 16 Cr. 588 (PAC) (the "Superseding Information") was filed on September 7, 2016, in three counts. The Superseding Information charged Doe-2 with the same three offenses that had been charged in the Information against Doe-1.

That same day, Doe-2 pleaded guilty to the three counts of the Superseding Information, pursuant to a written cooperation agreement with the Government.

On May 15, 2018, Judge Crotty sentenced Doe-1 and Doe-2 each to an aggregate term of 144 months' imprisonment, to be followed by five years' supervised release, and a $300 mandatory special assessment. Judge Crotty also ordered Doe-1 to pay a $1,020,000 fine and Doe-2 to pay a $390,000 fine.

Doe-1 and Doe-2 are serving their sentences.

**Statement of Facts**

**A.** [Doe-1's] **Drug Trafficking Activities in Mexico**

[Doe-1] became involved in the drug trade in 1991, while still living in Mexico. ([Doe-1] PSR at 21).[1] Over approximately the next decade, [Doe-1] worked for high-level Mexican drug traffickers, helping them, among other things, receive numerous multi-hundred kilogram loads of cocaine from Colombia and pay off corrupt law enforcement officials. (*Id.*). [Doe-1] also participated in a kidnapping that resulted in a murder. (*Id.*).

Soon after the kidnapping, Mexican authorities arrested [Doe-1], and he began cooperating with them. (*Id.*). [Doe-1] and his family, including [Doe-2], his son, were placed in protective custody in Mexico for several years, and they eventually re-settled in the United States, with the assistance of the Drug Enforcement Administration (the "DEA"), in approximately 2003. (*Id.*). The DEA paid [Doe-1] approximately $75,000 a year during his first two years in the United States. (*Id.*).

---

[1] "[Name] PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with the named defendant's sentencing; "[Name] Br." refers to the named defendant's brief on appeal; "[Name] A." refers to the appendix filed with the named defendant's brief; and "Add." refers to the addendum to this brief.

## B. The Defendants' Work as DEA Confidential Sources

Starting in approximately 2006, ██Doe-1██ began working as a DEA confidential source. (Doe-1 PSR at 21). Over the time he worked as a DEA confidential source, ██Doe-1██ was paid approximately $720,000 by the DEA and $250,000 to $300,000 by local law enforcement agencies. (██Doe-2██ A. 186). In approximately 2012, ██Doe-2██ also began working as a DEA confidential source, and over the next four years, was paid approximately $190,000 by the DEA and $150,000 to $200,000 by local law enforcement. (*Id.*). In connection with their work as confidential sources, both defendants entered into written agreements with the DEA, acknowledging that they were not authorized to engage in criminal conduct unless it was at the direction of law enforcement (the "Confidential Source Agreements"). ██Doe-2██ A. 3).

Starting in about 2012, the defendants' work for the DEA included traveling to Central America and South America. (*See* ██Doe-2██ A. 187).

██Doe-1██ ██Doe-2██

(*Id.*).

In a separate investigation, the DEA dispatched Doe-1 and Doe-2 to Venezuela in October 2015 to meet with Efrain Campo Flores and Franqui Flores de Freitas (the "Floreses"), the nephews of that country's first lady. *See United States v. Campo Flores*, No. 15 Cr. 765 (PAC), 2016 WL 5946472, at *2 (S.D.N.Y. Oct. 12, 2016). While in Venezuela, Doe-1 and Doe-2 recorded three drug-related meetings with the Floreses. *See id.* at *2. In November 2015, the DEA sent Doe-1 to Haiti for another meeting with the Floreses, after which the Haitian police and the DEA arrested the Floreses based on an indictment returned in the Southern District of New York and assigned to Judge Crotty (the "*Flores* case"). *See United States v. Campo Flores*, No. 15 Cr. 765 (PAC), 2017 WL 1133430, at *1 (S.D.N.Y. Mar. 24, 2017).

The defendants' work as confidential sources also contributed to other prosecutions in the Southern District of New York and the Eastern District of Virginia. (*See* Doe-2 A. 186-87).

## C. The Defendants' Unauthorized Drug Trafficking Activities

However, in approximately April 2016, with trial in the *Flores* case about seven months away, the DEA learned from another confidential source that Doe-1 and Doe-2 were also engaging in undisclosed, unauthorized drug trafficking. (Doe-1 PSR ¶ 11; Doe-2 PSR ¶ 11).

After an investigation, agents and prosecutors confronted both Doe-1 and Doe-2. Based on their admissions, the Government learned that, without telling

the DEA, [Doe-1] and [Doe-2] had functioned as middle-men between Mexican drug suppliers and their customers in the United States. Generally, Mexican drug suppliers asked [Doe-1] and/or [Doe-2] to pick up drugs from locations in Southern California and then distribute the drugs to customers in the United States. ([Doe-1] PSR ¶¶ 10-23, 27-29, 31-32; [Doe-2] PSR ¶¶ 10-23, 27-29, 31-32). [Doe-2] engaged in additional unauthorized drug transactions without [Doe-1's] apparent involvement. ([Doe-2] PSR ¶¶ 24-26, 30, 33).

[Doe-1] participated in unauthorized transactions involving, at least, more than nine kilograms of cocaine, approximately five kilograms of heroin, and more than nine kilograms of methamphetamine. ([Doe-1] PSR ¶ 41). [Doe-2] participated in unauthorized transactions involving, at least, more than 362 kilograms of cocaine, approximately five kilograms of heroin, more than 13 kilograms of methamphetamine, and more than 20 kilograms of marihuana. ([Doe-2] PSR ¶ 41).

## D. The Defendants' Guilty Pleas and Cooperation Agreements

[Doe-1] and [Doe-2] were charged in a criminal complaint and arrested in early August 2016. ([Doe-2] A. 1-6). On September 1, 2016, [Doe-1] pleaded guilty to the Information, pursuant to a cooperation agreement (the "[Doe-1] Cooperation Agreement"). ([Doe-1] PSR ¶ 6). On September 7, 2016, [Doe-2] pleaded guilty to the Superseding Information, pursuant to a cooperation agreement (the "[Doe-2] Cooperation Agreement," and together with the [Doe-1] Cooperation Agreement, the "September 2016 Cooperation Agreements"). ([Doe-2]

PSR ¶ 6). The September 2016 Cooperation Agreements required both defendants to "truthfully and completely disclose all information with respect to the activities of himself and others concerning all matters about which this Office inquires of him"; "truthfully testify . . . at any trial and other court proceeding with respect to any matters about which this Office may request his testimony"; "bring to this Office's attention all crimes which he has committed"; and "commit no further crimes whatsoever." (*See* Doe-2 A. 18; Add. 2-3).

### E. The Defendants' Suppression Hearing Testimony in the *Flores* Case

On September 8 and 9, 2016, Judge Crotty conducted a suppression hearing in the *Flores* case. *See Campo Flores*, 2016 WL 5946472, at *1. One of the issues at the hearing concerned the alleged spoliation of recordings Doe-1 and Doe-2 had made during their meetings with the Floreses in Venezuela in October 2015, and a cocaine sample that the Floreses had brought to one of the meetings. *See id.* at *1-*2. Doe-1 and Doe-2 testified as Government witnesses under the pseudonyms "CS-1" (Doe-1) and "CS-2" (Doe-2). Doe-2 A. 184 n.1).

As relevant here, Doe-2 testified on direct examination that he and Doe-1 recorded three drug-related meetings with the Floreses in Venezuela but did not record a fourth meeting, which took place at a disco. (Add. 9). Consistent with his pre-hearing disclosures to the Government, Doe-2 stated that a "friend," who had been "on the flight [Doe-1 and Doe-2 took] from

Mexico to Venezuela," also accompanied them to the disco meeting. (Add. 8-9). Doe-2 added that he and Doe-1 had "established a stronger friendship" with the friend during the time they had been waiting at the hotel in Caracas to meet with the Floreses. (Add. 9).

On cross-examination, and inconsistent with prior disclosures to the Government, Doe-2 admitted that the friend had accompanied Doe-2 and Doe-1 not only to the disco, but also to the three drug-related meetings they had with the Floreses. (Add. 13-15). Doe-2 testified that he had known the friend before meeting him on the flight, but that the friend did not, as far as Doe-2 knew, go to Caracas "purposely" to be with Doe-1 and Doe-2. (Add. 11-12). Doe-2 also denied having "plan[ned] beforehand for [the friend] to accompany" Doe-2 and Doe-1 to Caracas. (Add. 12). Further, Doe-2 admitted that he had failed to disclose to the DEA, prior to his arrest, that the friend had attended the meetings in Venezuela with him and Doe-1. (Add. 16).

During the lunch break following Doe-2's testimony, the Government met with Doe-1 and confronted him about the presence of the friend at the three drug-related meetings in Venezuela. (Doe-2 A. 185). During the mid-hearing, lunchtime proffer, Doe-1 admitted for the first time that he and Doe-2 had brought the friend, named "Paul," to Caracas without the DEA's permission, that Paul had previously assisted them in a real (and unauthorized) drug deal, and that Paul had been present in the October 2015 drug-related meetings with the Floreses. (*See* Add. 17, 19-20).

Following the suppression hearing, the Government conducted two more proffers with Doe-2 about the

presence of Paul during the trip to Venezuela. The second proffer was necessary because Doe-2 once again withheld information during the first session. Doe-2 A. 251). He ultimately admitted, contrary to his suppression hearing testimony, that Paul's presence in Venezuela was not "plan[ned] beforehand"; rather, he and Doe-1 knew Paul from Mexico, Doe-2 invited him to come to Caracas without telling the DEA to enhance the Floreses' perception of Doe-2 and Doe-1 as legitimate drug traffickers, and Doe-2 had paid Paul's expenses with money received from the DEA. Doe-2 A. 190-91). Given Doe-2's admissions, which were inconsistent with his suppression hearing testimony, the Government decided to make additional disclosures to the District Court and to defense counsel in the *Flores* case. (Doe-2 A. 191). Moreover, Doe-2's lack of candor regarding Paul contributed to the Government's decision not to call him as a witness at the *Flores* trial, which occurred in November 2016. (Doe-2 A. 251-52).

## F. Doe-1's Testimony at the *Flores* Trial

Doe-1 testified at the *Flores* trial pursuant to his cooperation agreement.[2] During cross-examination, Doe-1 denied communicating with Doe-2 after their arrests and denied conducting any drug transactions while in jail. (Doe-1 A. 75; Add. 22). Thereafter, defense counsel sought to confront Doe-1 with recordings

_____

[2]  With the District Court's permission, Doe-1 testified under the alias "Jose Santos Pena," and Doe-2 was referred to with the alias "Jose Santos Hernandez." (Doe-2 A. 184 n.1).

of telephone calls that he had made while incarcerated. (Add. 22). The recordings and corresponding transcripts and translations were received at trial the next day. (*E.g.*, Add. 24-43; [Doe-1] A. 63-77). While the Government does not necessarily credit all of the interpretations attributed to the calls by the Floreses' defense counsel, the documents, among other things, reflect [Doe-1] and [Doe-2] communicating with each other while in jail, in contrast to [Doe-1's] prior testimony. (*See* Add. 38-39). Indeed, the District Court noted in its post-trial opinion in the *Flores* case:

> [T]here is no doubt [Doe-1] testified falsely at trial. The clearest instance of perjury was [Doe-1's] testimony that he did not communicate with his son, [Doe-2], while they were in jail. [Defense counsel in the *Flores* case] effectively put the lie to [Doe-1's] testimony when the played recorded prison calls plainly showing that [Doe-1] and [Doe-2] communicated in jail.

*Campo Flores*, 2017 WL 1133430, at *6 (citations omitted)

On redirect examination, the Government informed [Doe-1] (and the jury) that his cooperation agreement was terminated and the Government would not file a motion at his sentencing for relief from the 10-year mandatory minimums pursuant to 18 U.S.C. § 3553(e) and United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5K1.1 (a "5K1.1 motion"). (Add. 44-45). The District Court subsequently instructed the jury that the Government had informed

Doe-1 "that he would not receive a 5K1 letter because he had lied." (Add. 47-48).

## G. The Presentence Reports and the Sentencing Submissions

In advance of sentencing in this case, the Probation Office calculated the applicable Guidelines range for each defendant. The Probation Office calculated an offense level of 39 for each defendant as follows: the base offense level was 38, pursuant to U.S.S.G. § 2D1.1(c)(1), because the aggregate quantity of narcotics involved in each defendant's offense conduct was greater than the equivalent of 90,000 kilograms of marihuana; two levels were added, pursuant to U.S.S.G. § 2D1.1(b)(1)(5), because the offense involved importation of methamphetamine; two levels were added for obstruction of justice, pursuant to U.S.S.G. § 3C1.1; and three levels were subtracted for acceptance of responsibility, pursuant to U.S.S.G § 3E1.1. (Doe-1 PSR ¶¶ 41-50; Doe-2 PSR ¶¶ 41-50).

The Probation Office assigned Doe-1 two criminal history points based on a 2007 California state court conviction for Grand Theft ("the California Conviction"). (Doe-1 PSR ¶ 52). The Probation Office determined that Doe-1's Guidelines range was 292 to 365 months' imprisonment, based on a total offense level of 39 and a Criminal History Category of II. (Doe-1 PSR ¶ 87). The Probation Office recommended a sentence of 292 months. (Doe-1 PSR at 19).

The Probation Office determined that Doe-2 had no criminal history points. (Doe-2 PSR ¶ 53). The Probation Office calculated Doe-2's Guidelines range as 262

to 327 months' imprisonment, based on a total offense level of 39 and a Criminal History Category of I. (Doe-2 PSR ¶ 83). The Probation Office recommended a sentence of 262 months for Doe-2. (Doe-2 PSR at 18).

Before sentencing, Doe-1 filed a motion asking the District Court to (i) compel the Government to file a 5K1.1 motion for Doe-1 and (ii) find that the California Conviction did not result in two criminal history points and render Doe-1 ineligible for safety-valve relief pursuant to U.S.S.G. § 5C1.2. (Doe-1 A. 36-113, 120-35). Among other things, Doe-1 challenged the meaning attributed to the jailhouse calls between Doe-1 and Doe-2 introduced at the *Flores* trial, arguing that Doe-1 had not engaged in drug trafficking after his arrest and had not lied under oath, and discussed what he viewed as the "almost unprecedented . . . magnitude" of Doe-1's cooperation with law enforcement. (*See* Doe-1 A. 51-56). Doe-1 asked the District Court to impose a sentence "less than the [ten-year] mandatory minimum." (Doe-1 A. 134).

Doe-2 also filed a sentencing submission. (Doe-2 A. 67-89). Similar to Doe-1, Doe-2's submission focused on his assistance to law enforcement over the years. ███████████████████████████████████████████████ A. 71). ███████ also noted that his assistance placed him and his family at "great personal danger," particularly when operating overseas, including "inside Venezuelan government offices" during the *Flores* investigation. (*Id.*). Doe-2 requested a sentence of time served in light of his cooperation, also noting that he had already spent 21 months in jail

since his arrest. (■Doe-2■ A. 67). ■Doe-2's■ submission did not make any argument regarding eligibility for safety-valve relief.

In its sentencing submission, the Government acknowledged both defendants' work as DEA confidential sources prior to their arrests and that this work had led to a number of prosecutions. (■Doe-2■ A. 186-87). However, the Government also noted that both defendants had breached the September 2016 Cooperation Agreements and that, accordingly, the Government would not be filing 5K.1 motions on their behalf. (■Doe-2■ A. 184, 188). Further, the Government explained that, under applicable case law, the Government could not be compelled to file a 5K1.1 motion unless it acted in bad faith, which it had not. (■Doe-2■ A. 188). The Government argued that, in light of the defendants "unauthorized drug-trafficking activities while acting as paid confidential sources, their lies to the DEA to conceal those activities, and their violations of [the September 2016 Cooperation Agreements]," the 120-month mandatory minimum applied and that "within-Guidelines sentences are appropriate for each defendant." (■Doe-2■ A. 188). Further, the Government argued that the Court should order forfeiture, or in the alternative impose fines, in the amounts the defendants received from law enforcement during their work as confidential sources—approximately $1,020,00 for ■Doe-1■ and $390,000 for ■Doe-2■. (■Doe-2■ A. 188)

## H. The Defendants' Sentencings

The District Court conducted a joint sentencing proceeding for both defendants on May 15, 2018. (Doe-2 A. 230-283).

Before imposing sentence, the District Court held an extended colloquy on Doe-1's motion to compel the Government to file a 5K1.1 motion (Doe-2 A. 242-255), which Doe-2 orally joined (Doe-2 A. 246-47). After hearing argument, the District Court found there had been no showing of bad faith by the Government in declining to file a 5K1.1 motion for either defendant. (Doe-2 A. 257). The District Court noted, among other facts, that the defendants initially failed to disclose that Paul had accompanied them to Venezuela; that Doe-2 lied at the suppression hearing, necessitating supplemental post-hearing disclosures by the Government; and that the court had already found, in the *Flores* post-trial decision, that Doe-1 lied under oath. (Doe-2 A. 256-58).

The District Court also heard argument on Doe-1's contention that his California Conviction should be assigned only one criminal history point, thus satisfying the criminal-history criterion for safety-valve relief. (Doe-2 A. 258-65). The District Court found that Doe-1's California Conviction was properly assigned two criminal history points under the Guidelines and thus Doe-1's Criminal History Category was II. (Doe-2 A. 266).

The District Court then asked the Government for its position on sentencing. (Doe-2 A. 269-70). The Government argued that the defendants were not eligible

for safety-valve relief because the prison calls introduced at the *Flores* trial indicated that the defendants had "not fully disclosed the complete course of their drug trafficking conduct." (Doe-2 A. 270-71). In addition, the Government reiterated its written request for financial penalties of $1,020,000 for Doe-1 and $390,000 for Doe-2, reflecting the funds the DEA paid the defendants during the course of their drug trafficking crimes. (Doe-2 A. 271). Defense counsel did not object to the Government's request.



(*Id.*).

In imposing sentence on Doe-1, the District Court calculated the Criminal History Category as II and the Guidelines offense level as 39, resulting in a Guidelines range of 292 to 365 months' imprisonment. (Doe-2 A. 274). In reviewing the § 3553(a) factors, Judge Crotty noted that it was a "very difficult case" and that he was "tak[ing] . . . into consideration" Doe-1's "cooperation over an extended period of time" and the 18-

year sentences imposed on the Floreses. (Doe-2 A. 274-76). The court concluded, however, that Doe-1 "was trying to take advantage of his cooperative status, getting paid for it and doing pretty much what he could get away with." (Doe-2 A. 275). Judge Crotty imposed a below-Guidelines sentence of 144 months' imprisonment on each of Counts One and Two and 60 months' imprisonment on Count Three, all to run concurrently. (Doe-2 A. 277). The District Court imposed five years' supervised release on each of Counts One and Two and a three years' supervised release on Count Three, to be served concurrently, and imposed all standard supervised release conditions. (*Id.*). The court also imposed a fine of $1,020,000. (*Id.*). Doe-1's counsel noted that "it might be very difficult for him to pay the fine, but there is nothing legally objectionable about the sentence." (*Id.*).

The District Court next sentenced Doe-2 noting that it had "considered the same documents and draw[n] on the same resources" as it had in sentencing Doe-1. (Doe-2 A. 280). The District Court calculated the Guidelines range as 262 to 327 months' imprisonment (Doe-2 A. 278), and found that Doe-2 did not satisfy "the final criterion for safety valve treatment." (Doe-2 A. 280). Judge Crotty imposed a below-Guidelines sentence of 144 months' imprisonment on each of Counts One and Two and 60 months' imprisonment on Count Three, all to run concurrently. (*Id.*). The District Court imposed five years' supervised release on each of Counts One and Two and three years' supervised release on Count Three, to be served concurrently, and imposed all standard supervised release conditions. (*Id.*). The District Court also imposed a fine of

17

$390,000. (Doe-2 A. 281). Doe-2's counsel noted that he had "[n]o legal objections at this time" to the sentence but remarked that Doe-2 "has no financial ability to pay the fine at this time." (*Id.*).

## A R G U M E N T

### POINT I

#### The District Court Properly Denied Doe-2 Safety-Valve Relief

Doe-2 contends that the District Court erred in concluding that he was not eligible for safety-valve relief under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. The District Court did not clearly err in finding that Doe-2 failed to carry his burden of establishing the fifth criterion for safety-valve relief, *i.e.*, that he had truthfully and completely provided all information about the crimes of which he was convicted and all relevant conduct. Accordingly, the District Court correctly determined that Doe-2 was not eligible for a sentence below the applicable mandatory minimums or for a two-level reduction in his offense level.

### A. Applicable Law

Convictions under 21 U.S.C. §§ 841(b)(1)(A) and 960(b)(1) carry ten-year mandatory minimum prison sentences. However, the safety-valve provisions in effect at the time of the sentencings in this case entitled a defendant to "a sentence pursuant to [the] guidelines . . . without regard to any statutory minimum sentence," provided the defendant met five criteria: (1) the

defendant had no more than one criminal history point; (2) the defendant "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon . . . in connection with the offense"; (3) no one was killed or seriously hurt as a result of the offense; (4) the defendant was not an organizer, leader, manager, or supervisor in the offense and was not engaged in a continuing criminal enterprise; and (5) "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f) (2017);[3] *accord* U.S.S.G. § 5C1.2(a) (2016). A defendant who meets all five criteria is also eligible for a two-level reduction in his offense level. U.S.S.G. § 2D1.1(b)(17) (2016).

The defendant has the burden of proving by a preponderance of the evidence that he has met all five safety-valve criteria. *United States v. Jimenez*, 451 F.3d 97, 102 (2d Cir. 2006); *United States v. Conde*, 178 F.3d 616, 620 (2d Cir. 1999). With regard to the fifth requirement—that the defendant provide complete

---

[3]   On December 21, 2018, Congress amended the safety-valve criterion related to criminal history. First Step Act of 2018, Pub. L. No. 115-391, § 402(a)(1)(B), 132 Stat. 5194, 5221. However, the amended provision applies "only to a conviction entered on or after the date of enactment." *Id.* § 402(b). Because the defendants were sentenced on May 15, 2018, the amendment is not applicable here.

and truthful information to the Government—it is the defendant's burden "to *prove* to the court that he has provided the requisite information if he is to receive the benefit of the statute." *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir. 1997) (emphasis in original).

This means that the defendant must provide "complete information," *i.e.*, "an exhaustive and truthful portrayal of his knowledge of his offense conduct and all related activity." *United States v. Nuzzo*, 385 F.3d 109, 118-19 & n.25 (2d Cir. 2004) (footnote omitted). In a conspiracy case, the defendant must "disclose all he knows concerning both his involvement and that of any co-conspirators." *United States v. Ortiz*, 136 F.3d 882, 883 (2d Cir. 1997) (quotation marks omitted). Furthermore, the defendant "must provide truthful information regarding" not only "'the offense of conviction'" but also "'all relevant conduct'" under U.S.S.G. § 1B1.3. *Gambino*, 106 F.3d at 1111 (quoting U.S.S.G. § 5C1.2 cmt. n.3). Moreover, the defendant "must prove *both* that the information he or she provided to the Government was objectively true *and* that he or she subjectively believed that such information was true." *United States v. Reynoso*, 239 F.3d 143, 146 (2d Cir. 2000) (emphasis in original). If there is no credible evidence to support a defendant's characterization of the events at issue, a district court is entitled to reject the defendant's explanation and to conclude that he has not truthfully provided information with regard to the offense and any relevant conduct. *See, e.g.*, *Conde*, 178 F.3d at 621 (affirming denial of safety-valve relief where district court "was not required to credit" defendant's "denials and explanations"); *Gambino*, 106

F.3d at 1110 (affirming denial of safety-valve relief where district court discounted defendant's version of offense as incredible).

This Court "owe[s] a district court deference with respect to factual findings, especially those based on witness credibility." *Nuzzo*, 385 F.3d at 118. Accordingly, this Court reviews a district court's factual findings regarding the applicability of the safety-valve provisions, including the determination of whether a defendant has truthfully provided information in satisfaction of Section 3553(f)(5), for clear error. *Ortiz*, 136 F.3d at 883. In reviewing a district court's factual findings, this Court "must view the evidence in the light most favorable to the government." *United States v. Gasperini*, 894 F.3d 482, 485 (2d Cir. 2018) (quotation marks omitted).

"A finding of fact is clearly erroneous only if, after reviewing all of the evidence, this Court is left 'with the definite and firm conviction that a mistake has been committed.'" *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). So long as "'the district court's account of the evidence is plausible in light of the record viewed in its entirety,'" this Court "'may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *United States v. Cho*, 713 F.3d 716, 722 (2d Cir. 2013) (quoting *Anderson*, 470 U.S. at 573-74). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United*

*States v. Ulbricht*, 858 F.3d 71, 124 (2d Cir. 2017) (quotation marks omitted), *cert. denied*, 138 S. Ct. 2708 (2018).

## B. Discussion

Doe-2 argues that the District Court erred by not granting him safety-valve relief, which would have made him eligible for a sentence below the applicable mandatory minimums and for a two-level reduction in his offense level. Doe-2 did not seek safety-valve relief in his written sentencing submission or during his oral argument at sentencing. Nor did Doe-2 object when the District Court ruled that Doe-2 failed to meet "the final criterion for safety valve treatment." (Doe-2 A. 280). Thus, Doe-2's claim is reviewed only for plain error. *See United States v. Marcus*, 560 U.S. 258, 262 (2010) (setting forth plain-error standard). In any event, Doe-2's claim fails under any standard of review. The District Court correctly found, and certainly did not clearly or plainly err in finding, that Doe-2 had failed to carry his burden to prove that he had truthfully disclosed all the information he had about his offenses and relevant conduct.

The Government explained on the record at the sentencing proceeding that the prison calls introduced by the defense at the *Flores* trial, which had been appended to the Government's sentencing submission, at the very least raised significant questions as to whether Doe-1 and Doe-2 had disclosed "all information" to the Government regarding their unauthorized drug trafficking activities. For example, based on

the translations provided by the *Flores* defendants, after the defendants' arrests, Doe-2 and an associate discussed a "120-buck customer who showed up," who had previously been involved in a transaction involving "around 140 of . . . those pills." Doe-2 A. 224-25). The associate told Doe-2 that "that dude . . . bought another car, you know" (Doe-2 A. 225), and Doe-2 later instructed the associate that "as far as the car, when a customer appears on the scene, 120, 130, whatever comes up give that money to . . . give it to . . . you understand me?" (Doe-2 A. 227). Given the context of the discussion regarding a "customer" that Doe-2 knew who had previously bought 140 pills, and the fact that Doe-2 was directing where the money should go, it was reasonable for the District Court to infer that "car" was simply coded language intended to conceal that this conversation was really about a drug transaction.[4]

On appeal, Doe-2 takes issue with the meaning attributed to the calls. (Doe-2 Br. 20-22). But the District

---

[4]   On the same call, Doe-2 told the associate, "well, there was a little problem with the investigation and shit, but it wasn't . . . like we were *caught* with anything, you know what I mean? None of that, nothing like that." (Doe-2 A. 211 (emphasis added)). On the same call, Doe-1 (to whom Doe-2 passed the phone (Doe-2 A. 213)), after being informed by the associate that "things are being dealt with," told the associate "not to make too much noise" (Doe-2 A. 219), and that "they don't have anything on us" (Doe-2 A. 221). These comments further support the inference that Doe-2 and Doe-1 were concealing undisclosed criminal activity.

Court had before it similar complaints, such as the argument that one of the calls concerned the sale of a car, and not drug dealing. (Doe-1 A. 87-88 (letter from Doe-1's counsel to Government taking issue with the translations, appended to Doe-1's sentencing submission)). The District Court did not clearly err in rejecting—or at least finding that Doe-2 failed to carry his burden by merely offering—such self-serving explanations. *See Conde*, 178 F.3d at 621 (district court "was not required to credit" defendant's "denials and explanations" offered through counsel at sentencing).

Doe-2 also asserts that the Government did not "suggest untruthfulness or incompleteness" in a letter to the District Court regarding Doe-2's proffers. (Doe-2 Br. 22-23 (citing Doe-2 A. 190)). In fact, the opposite is true. The letter in question was prompted by Doe-2's false testimony under oath at the *Flores* suppression hearing regarding "Paul" and the Government's subsequent debriefings of Doe-2. (Doe-2 A. 190 (noting "additional facts disclosed by Doe-2] following his testimony during the hearing on September 9, 2016")). Moreover, as the Government noted at sentencing, it proffered Doe-2 twice following the *Flores* suppression hearing because, in the Government's view, the first post-hearing proffer "did not result in candid disclosures" by Doe-2. (Doe-2 A. 251).

Ultimately, Doe-2 admitted that he had, without telling the DEA, invited "Paul" on the trip to Caracas to "enhance" the Floreses' perception of Doe-2 and Doe-1 as legitimate drug traffickers, and that he had promised "Paul" a payment if the cocaine transaction with the Floreses was successful (when, in fact, it was

a sting operation in which the defendants had no legitimate expectation of receiving actual drug proceeds). (Doe-2 A. 190-91). These disclosures raised significant questions about Doe-2's credibility generally. They were contrary to Doe-2's pre-hearing statements to the Government (in which he failed to disclose that Paul had accompanied him and Doe-1 to the three drug-related meetings with the Floreses) and his testimony at the *Flores* suppression hearing (in which he had indicated that Paul's presence in Caracas had not been planned "beforehand"). This history supported the District Court's determination that Doe-2 failed to satisfy the truthful-disclosure requirement. *See Nuzzo*, 385 F.3d at 119 n.25 (court may consider "prior lies and omissions in determining whether the defendant has met his burden of proving that the information provided as of sentencing is complete and truthful"); *United States v. Jeffers*, 329 F.3d 94, 99 (2d Cir. 2003) ("[P]rior perjurious acts may affect the defendant's credibility and his corresponding ability to satisfy the safety valve's truthful disclosure requirement."); *United States v. Schreiber*, 191 F.3d 103, 109 (2d Cir. 1999) ("The fact that appellant repeatedly lied and obstructed justice prior to allegedly telling the complete truth will be useful in evaluating whether appellant's final proffers were complete and truthful.").

Moreover, the fact that Paul was apparently ready, willing, and able to accept Doe-2's invitation to go on what Paul was apparently told was a trip to negotiate a massive cocaine deal raised significant questions about the extent of Doe-2 and Paul's prior drug trafficking activities together—which Doe-2 had not disclosed to the Government. And Doe-2 did not attempt

to rebut or answer these questions following his post-suppression hearing debriefing, as was his burden if he wished to qualify for safety-valve relief. This may well have been strategic, as additional truthful disclosures by Doe-2 would likely have led to additional sentencing exposure under the Guidelines based on increased drug quantities.

In sum, the District Court did not err, let alone clearly or plainly so, in finding that Doe-2 failed to meet his burden of showing that he had truthfully disclosed the full scope of his unauthorized drug-trafficking activity.[5]

---

[5] In a footnote, Doe-1 adopts Doe-2's arguments on appeal without offering any independent argument regarding his own safety-valve eligibility. (Doe-1 Br. 23 n.7). The District Court determined, in agreement with the Probation Office, that Doe-1 had two criminal history points (Doe-2 A. 266; Doe-1 PSR ¶¶ 52-53), a ruling that Doe-1 does not challenge on appeal. Doe-1 was accordingly ineligible for safety-valve relief. *See* 18 U.S.C. § 3553(f) (2017) (safety-valve criteria include that "the defendant does not have more than 1 criminal history point"). As noted above, the First Step Act amendment expanding safety-valve eligibility postdated the defendants' sentencing and therefore is not applicable here. *See supra* at 18 n.3.

## POINT II

### The Defendants' Sentences
### Are Substantively Reasonable

Doe-1 and Doe-2 claim that their respective 144-month sentences, which are far below the applicable Guidelines ranges, are nevertheless substantively unreasonable. But the sentences are supported by the seriousness of the large-scale narcotics conspiracies in which the defendants participated, their failure to disclose their unauthorized drug trafficking to the DEA, and the fact that each defendant testified falsely during the *Flores* case. The sentences are substantively reasonable and should be affirmed.

### A. Applicable Law

This Court's review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). A defendant arguing that his sentence was substantively unreasonable "bears a heavy burden because [appellate] review of a sentence for substantive reasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). This Court considers "the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51 (2007). In applying this deferential standard, this Court must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190.

Thus, this Court does not "substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," and will "set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Id.* at 189 (quotation marks and emphasis omitted). This Court also bears in mind that a sentencing judge may take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). "The particular weight to be afforded aggravating or mitigating factors 'is a matter firmly committed to the discretion of the sentencing judge.'" *Broxmeyer*, 699 F.3d at 289 (quoting *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006)). Generally, if "the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, [this Court] will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor." *United States v. Pope*, 554 F.3d 240, 246-47 (2d Cir. 2009) (quotation marks omitted).

In discussing these familiar principles, this Court has explained that appellate review for substantive reasonableness "provide[s] a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009).

## B. Discussion

Judge Crotty did not abuse his substantial discretion in sentencing each defendant to 144 months' imprisonment, which was less than half the low end of ▮Doe-1's▮ Guidelines range of 292 to 365 months and significantly below ▮Doe-2's▮ Guidelines range of 262 to 327 months. Nothing in the record indicates that the District Court misunderstood any of the Section 3553(a) factors; to the contrary, the court thoroughly considered and reviewed these factors. (*See* ▮Doe-2▮ A. 274-76, 280). Indeed, the record shows that the court reviewed and considered—and in many instances, credited—the arguments in favor of mitigation that the defendants reiterate on appeal, in particular that their cooperation with the Government warranted leniency. ▮Doe-2▮ A. 275).

In pressing the argument that Judge Crotty erred by not going even further below the Guidelines, the defendants minimize the extent to which they breached their obligations to the Government. As Judge Crotty recognized, prior to their arrests, the defendants repeatedly breached their Confidential Source Agreements with the DEA by engaging in unauthorized drug trafficking and failing to disclose that conduct to the DEA. They also breached the September 2016 Cooperation Agreements with the U.S. Attorney's Office, most notably by lying under oath. (*See* ▮Doe-2▮ A. 275 (District Court citing both the "violat[ion] of the existing agreements with the DEA . . . from 2012 to 2016" and the "cooperation agreement" as "reflective of [▮Doe-1's▮] conduct that's involved here")).

Further, while both defendants suggest that their actions did not harm or undermine any Government investigations (Doe-2 Br. 28; Doe-1 Br. 43), the District Court was free to conclude otherwise. After all, Judge Crotty had presided over the *Flores* suppression hearing and trial and thus personally witnessed Doe-1's and Doe-2's performances on the witness stand. Moreover, the Government noted at sentencing that the defendants' misconduct and resulting unavailability as witnesses led to █████████████████████████ ███████████████████████████████████ ████████████ (█████ A. 273).

The defendants' arguments boil down to a disagreement with how Judge Crotty weighed the sentencing factors in this case. However, "[t]he particular weight to be afforded aggravating and mitigating factors 'is a matter firmly committed to the discretion of the sentencing judge.'" *Broxmeyer*, 699 F.3d at 289 (quoting *Fernandez*, 443 F.3d at 32)).

As this Court has observed, it is "difficult to find that a below-Guidelines sentence is unreasonable" because "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011) (quotation marks omitted). Indeed, this Court routinely affirms below-Guidelines sentences as substantively reasonable. *See, e.g.*, *United States v. Rivernider*, 828 F.3d 91, 102-03, 111, 114 (2d Cir. 2016) (affirming 144-month sentence where Guidelines range was 324 to 405 months, and

90-month sentence where Guidelines range was 210 to 262 months); *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016) (affirming 120-month sentence where Guidelines range was 151 to 188 months). Judge Crotty's decision to impose below-Guidelines sentences was "located within the range of permissible decisions" in light of the totality of the circumstances. *Cavera*, 550 F.3d at 189 (quotation marks omitted). The defendants' sentences are substantively reasonable and should be affirmed.

## POINT III

### The District Court Did Not Abuse Its Discretion in Imposing Fines

Doe-1 and Doe-2 challenge the fines imposed by the District Court in the amounts of $1,020,000 and $390,000, respectively, on the ground that they are unable to pay the fines. But the defendants failed to carry their burden of establishing their inability to pay, particularly in light of the uncontested proof that they received funds in those amounts for working as confidential law enforcement sources while they were also making additional money illegally through unauthorized drug trafficking. Accordingly, the District Court did not abuse its discretion in imposing these fines.

### A. Applicable Law

In determining whether to impose a fine and calculating the fine amount, a district court "must consider the Guidelines recommendation for the imposition of a fine, consider the § 3553(a) factors, and consider the fine-specific factors listed in 18 U.S.C. §§ 3571 and

3572." *United States v. Elfgeeh*, 515 F.3d 100, 136 (2d Cir. 2008). The ultimate decision regarding a fine "lies within the discretion of the district court." *United States v. Rattoballi*, 452 F.3d 127, 139 (2d Cir. 2006).

A district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). In determining the size of any fine, the district court is required to consider "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources." U.S.S.G. § 5E1.2(d)(2).

As indicated by the plain language of the Guidelines, the defendant bears the burden of demonstrating an inability to pay a fine. *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001). In evaluating whether a defendant has satisfied his burden of establishing inability to pay, a court "may consider both [his] present financial resources and those that may become available in the future." *Id.* "Although imposition of a fine may not be based upon suspicion that a defendant has sufficient funds to pay it, circumstantial evidence may be considered to decide what defendant earns or is capable of earning and what his financial resources are." *United States v. Fields*, 113 F.3d 313, 325 (2d Cir. 1997).

This Court reviews a fine imposed by a district court for reasonableness, *United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1262 (2019), which is "a particularly deferential form of abuse-of-discretion review." *Cavera*, 550 F.3d

at 187-88 & n.5. The district court's underlying factual findings are reviewed for clear error. *See Cavera*, 550 F.3d at 190; *United States v. Greer*, 285 F.3d 158, 178 (2d Cir. 2002).

## B. Discussion

### 1. The Defendants Failed to Carry Their Burden of Establishing Inability to Pay

The District Court did not abuse its discretion in imposing a fine of $1,020,000 on ▮Doe-1▮ and a fine of $390,000 on ▮Doe-2▮ These fines were squarely within the Guidelines fine range of $25,000 to $10 million. (▮Doe-1▮ PSR ¶¶ 95, 97; ▮Doe-2▮ PSR ¶¶ 91, 93); *see also* U.S.S.G. §5E1.2(c)(4) (maximum Guidelines fine is the statutory maximum where, as here, the statutory maximum exceeds $500,000). And contrary to the defendants' claims, the District Court did not abuse its discretion or clearly err in concluding that the defendants failed to demonstrate their inability to pay the fines.

The District Court's determination was amply supported by the record. The court had before it uncontroverted evidence that ▮Doe-1▮ and ▮Doe-2▮ had worked for years as confidential sources for law enforcement, during which time they received approximately $1 million and $400,000, respectively.[6] Thus, the record estab-

---

[6] Although ▮Doe-2▮ argues there was "no proof that the money had been paid" to him by the DEA (▮Doe-2▮ Br. 35), he and ▮Doe-1▮ described these payments while

lished that the defendants received hundreds of thousands of dollars from law enforcement while at the same time engaging in unauthorized drug trafficking. Such evidence defeats the defendants' assertion of inability to pay. *See Fields*, 113 F.3d at 325 ("Evidence of lucrative illegal activity may support an inference that such funds, although hidden, remain at the defendant's disposal."); *United States v. Orena*, 32 F.3d 704, 716 (2d Cir. 1994) (explaining that "evidence of lucrative illegal activity can support a judge's finding that a defendant is able to pay a fine").[7] Accordingly, unlike the cases cited by the defendants (Doe-1 Br. 28-30), the fines here were not based on the mere "*possibility* of future assets," *United States v. Tanaka*, 644 F. App'x 36, 39 (2d Cir. 2016), speculation that the defendant had "'made a lot of money' from his crimes," *United States v. Walker*, 262 F. App'x 303, 309 (2d Cir. 2008), or the defendant's status as a "'young person [who] will eventually be working, hopefully,'" *United*

---

under oath at the *Flores* suppression hearing. (Add. 10, 18).

[7] Furthermore, both defendants reported substantial employment histories suggesting that they will be able to earn income after their release from prison. (Doe-1 PSR ¶¶ 79-80; Doe-2 PSR ¶¶ 76-77); *see United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000) (court may consider defendant's "capacity to pay the fine from prison earnings or from earnings after his release from prison" (citations omitted)).

*States v. Rivera*, 971 F.2d 876, 895 (2d Cir. 1992). Instead, the fines reflected large sums of money indisputably received by both defendants.

The defendants nevertheless contend that their burden to establish inability to pay was satisfied by the Presentence Reports, in which the Probation Office recommended no fine, and the fact that the defendants were represented by appointed counsel. (Doe-1 Br. 28-29; Doe-2 Br. 36). Such factors are "entitled to weight," but "neither is conclusive." *Fields*, 113 F.3d at 325-26.[8] Here, there was ample reason for the District Court to reject the Probation Office's recommendations. As discussed above, uncontroverted evidence showed that the defendants earned hundreds of thousands of dollars as law enforcement confidential sources. Yet the "Employment Record" section of each Presentence Report makes no mention of the defendants' work as confidential sources. Nor does the "Financial Condition: Ability to Pay" section of each Presentence Report discuss the hundreds of thousands of dollars the defendants indisputably received. (*See* Doe-1 PSR ¶¶ 79-85; Doe-2 PSR ¶¶ 76-80). These gaps in the Presentence Reports suggest either that the defendants were not forthcoming in the employment and financial information they provided to the Probation Office, or that the Probation Office neglected to consider this information in formulating its recommendation. In either

---

[8] This is so even when, as here, the Government did not object to a presentence report's recommendation of no fine based on inability to pay. *See United States v. Sasso*, 59 F.3d 341, 352 (2d Cir. 1995).

event, the District Court did not abuse its discretion in concluding that the Presentence Reports were not sufficient to satisfy the defendants' burden of proving their inability to pay. *See Sasso*, 59 F.3d at 352 (given that defendant "was not forthcoming with respect to his financial circumstances, it was well within the province of the district court to find that he had not carried his burden of proving inability to pay").[9]

### 2. The Defendants Had an Adequate Opportunity to Prove Inability to Pay

The defendants next claim not to have had an adequate opportunity to establish an inability to pay. (Doe-1 Br. 32; Doe-2 Br. 36). A defendant need only be provided a "minimal opportunity" to prove his inability to pay a fine. *Elfgeeh*, 515 F.3d at 136. The defendants

---

[9] *United States v. Corace*, 146 F.3d 51 (2d Cir. 1998), is not to the contrary. (*See* Doe-1 Br. 30-31). In *Corace*, the presentence report's recommendation of no fine based on inability to pay was "significant[ly] corroborat[ed]" by the defendant's "obligation to make restitution of $2.7 million to his victims," and this Court accordingly remanded for reconsideration of whether a fine would "impair his ability to make restitution." 146 F.3d at 57; *see also* 18 U.S.C. § 3572(b) ("[T]he court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution"). *Corace* is inapplicable here because the defendants were not ordered to pay restitution.

had that opportunity here. The defendants' coopera-
tion agreements advised them that they were subject
to fines of up to $10 million. (████ A. 16; Add. 1). Prior
to sentencing, the Government filed a submission ex-
plicitly asking the District Court to "forfeit the funds
paid to [the defendants] by law enforcement during the
course of their employment as confidential sources"—
"approximately $1,020,000" for ████ and "approxi-
mately $390,000" for ████ —or, "[i]n the alterna-
tive, . . . impose fines in the same amount." (████
A. 188). Thus, the defendants were on notice of poten-
tial fines in the amounts they received while working
as confidential sources. *Cf. Elfgeeh*, 515 F.3d at 137
(cited in ████ Br. 36) (vacating fine where, *inter alia*,
the Government had not made any request for the fine
imposed). In the week between the filing of the Gov-
ernment's submission and the sentencing proceeding,
the defendants could have responded to the Govern-
ment's request, but they did not—even though ████
filed a lengthy written submission on other issues dur-
ing that same period. (████ A. 120-35).

The defendants also had the opportunity to address
their ability to pay during the sentencing proceeding.
The District Court heard lengthy arguments on other
legal issues raised by the defendants, including
whether the Government acted in bad faith in declin-
ing to make a 5K1.1 motion and whether ████ prior
conviction should be assigned one or two criminal his-
tory points. There is no reason to believe that the court
would have refused to hear from the defendants re-
garding their ability to pay, particularly when the
Government reiterated its request for financial penal-
ties. (████ A. 271). Furthermore, the court invited

each defendant to "elaborate on [his] submission" (Doe-2 A. 266, 278), thus providing the defendants an additional opportunity to raise any issues they believed to be salient. Doe-1 used that opportunity to specifically argue, in the context of advocating for a lenient sentence, that the money he paid as a confidential source was not as much as it might seem at first blush. He asserted, for example, that the amount was "not so" high on "an annualized basis," and that he had to spend some of it on travel and other costs associated with his work as a confidential source. (Doe-2 A. 267). Doe-2 did not specifically address the money he was paid as a confidential source, but he referred back to his written submission (Doe-2 A. 278), which requested no fine in light of his "limited financial resources" (Doe-2 A. 72). Finally, when the District Court imposed sentence on each defendant, including a fine in the amount requested by the Government, the court asked if there were any objections. Each defendant responded by suggesting that he would be unable to pay the fine. (Doe-2 A. 277, 281). But neither defendant offered additional evidence or argument to support that assertion or asked for additional time to gather and present such evidence or argument. In these circumstances, the defendants should not be heard to complain that they were not provided the requisite "minimal opportunity" to prove their inability to pay their fines. *Elfgeeh*, 515 F.3d at 136.

### 3. The District Court Was Not Required to Make Particularized Findings

Doe-1 also argues that the case should be remanded for the district court to make "specific findings regarding the defendant's ability to pay." Doe-1 Br. 31 (citing *United States v. Aregbeyen*, 251 F.3d 337, 339 (2d Cir. 2001))). But "[t]here is no requirement that explicit findings be made concerning the defendant's ability to pay the fine." *United States v. Tocco*, 135 F.3d 116, 133 (2d Cir. 1998); *see also Sasso*, 59 F.3d at 352 ("Where a fine falls within the Guidelines range, there is no requirement that the court state why it chose that fine."). Vacatur and remand for additional findings on ability to pay is only required when the "grounds" for the defendant's ability to pay "are unclear from the record." *Aregbeyen*, 251 F.3d at 339. As the discussion above demonstrates, the grounds for finding that the defendants are able to pay their fines (or at least that the defendants failed to establish their inability to pay) are clear from the record.

Thus, although the District Court was required to "consider . . . the defendant's income, earning capacity, and financial resources," 18 U.S.C. § 3572(a)(1), there was "no separate requirement that this consideration be articulated." *United States v. Marquez*, 941 F.2d 60, 65 (2d Cir. 1991).[10] With respect to articulating its reasons, the District Court was only required to comply

---

[10]  The District Court explicitly indicated in the defendants' judgments that it considered each defendant's ability to pay in waiving interest on the fine and

with "the general mandate of section 3553(c) that the sentencing court 'state in open court the reasons for its imposition of the particular sentence.'" *Id.* (quoting 18 U.S.C. § 3553(c)). Here, the District Court explained its reasons for sentencing the defendants, noting, among other things, that Doe-1 "was trying to take advantage of his cooperative status, *getting paid for it and* doing pretty much what he could get away with." (Doe-2 A. 275 (emphasis added)). The District Court then "considered the same documents and dr[e]w on the same resources in . . . sentencing [Doe-2]" minutes later. (Doe-2 A. 280).[11]

In sum, the District Court did not abuse its discretion in imposing a fine of $1,020,000 on Doe-1 and a fine of $390,000 on Doe-2.[12]

————————

in ordering a lump sum payment. (Doe-1 A. 196-97; Doe-2 A. 290-91).

[11] Doe-1 also argues, for the first time on appeal, that any fine should be subject to "a reasonable schedule of payments." (Doe-1 Br. 32). No such schedule is needed because the fine amounts will not accrue interest (Doe-1 A. 196; Doe-2 A. 290), and a defendant "may assert his continuing indigence as a defense to any effort by the government to collect [a] fine." *Thompson*, 227 F.3d at 47.

[12] If, however, this Court were to vacate the fines and remand, the mandate should make explicit that the District Court has "the authority . . . to revise upward one component of a sentence after another component was held to have been invalidly imposed."

## POINT IV

### Defendants' Challenges to Two Standard Supervised Release Conditions Should Be Denied

The defendants challenge two standard conditions of supervised release imposed by the District Court. The challenge to standard condition 12, concerning whether a supervisee poses a risk to another person, is moot because that condition has been vacated by a standing order in the Southern District of New York. Doe-1 also contends, for the first time on appeal, that standard condition 8, which prohibits communicating or interacting with someone the supervisee knows is engaged in criminal activity or is a convicted felon, is unconstitutionally vague and overbroad and interferes with his rights of association. Because this standard condition is constitutional, the District Court did not abuse its discretion, let alone commit plain error, in imposing the condition.

––––––––––

*United States v. Versaglio*, 85 F.3d 943, 948-49 (2d Cir. 1996); *accord United States v. Rosario*, 386 F.3d 166, 170 (2d Cir. 2004). Thus, if the District Court were to impose a lower fine or no fine at all on remand, it would be "entirely appropriate" for the court to increase other components of the sentence, including the "terms of imprisonment." *United States v. Bohn*, 959 F.2d 389, 395 (2d Cir. 1992); *see also United States v. Young*, 932 F.2d 1035, 1038 (2d Cir. 1991).

## A. Applicable Law

A district court is required to impose certain mandatory conditions for every term of supervised release. *See* 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a). A district could may impose any other condition of supervised release that "it considers to be appropriate." 18 U.S.C. § 3583(d). Such a condition must be:

> reasonably related to (A) the nature and circumstances of the offense and the history and characteristics of the defendant; (B) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes of the defendant; and (D) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

U.S.S.G. § 5D1.3(b)(1); *see also* 18 U.S.C. § 3583(d). "Despite the use of the conjunctive in the Guidelines, a condition may be imposed if it is reasonably related to any one or more of the specified factors." *United States v. Brown*, 402 F.3d 133, 137 (2d Cir. 2005) (quotation marks omitted). In addition, the condition must "involve no greater deprivation of liberty than is reasonably necessary for the purposes set forth above," and must be "consistent with any pertinent policy statements issued by the Sentencing Commission." U.S.S.G. § 5D1.3(b)(2). Ultimately, the district court has "broad discretion to tailor conditions of supervised

release." *United States v. Gill*, 523 F.3d 107, 108 (2d Cir. 2008) (quotation marks omitted).

The Guidelines set forth certain "standard" conditions of supervised release that are "recommended" in every case. U.S.S.G. § 5D1.3(c)(1)-(13). Although standard conditions are classified as "discretionary" conditions under the Guidelines, U.S.S.G. § 5D1.3(b)-(c), that label is "misleading" because standard conditions "are so clearly necessary to supervised release." *United States v. Truscello*, 168 F.3d 61, 64 (2d Cir. 1999). Standard conditions are "basic administrative requirement[s] essential to the functioning of the supervised release system," *United States v. Smith*, 982 F.2d 757, 764 (2d Cir. 1992), and they "are almost uniformly imposed by the district courts," *Truscello*, 168 F.3d at 63. Standard conditions must comply with the requirements of U.S.S.G. § 5D1.3(b) set forth above, but a district court "need not analyze the factors on the record for each condition." *Smith*, 982 F.2d at 764. Standard conditions are "generally so appropriate to effect the purpose of supervised release," *Truscello*, 168 F.3d at 64, that they "are presumed suitable in all cases," *United States v. Asuncion-Pimentel*, 290 F.3d 91, 94 (2d Cir. 2002).

A challenge to a condition of supervised release is ordinarily reviewed for abuse of discretion, but it is reviewed only for plain error if the defendant had the opportunity to raise his challenge before the district court and failed to do so. *United States v. Dupes*, 513 F.3d 338, 342-43 & n.2 (2d Cir. 2008). Plain error is a stringent standard, requiring an appellant to demonstrate that "(1) there is an error; (2) the error is clear

or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Marcus*, 560 U.S. at 262 (quotation marks omitted). "Meeting all four prongs is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quotation marks omitted).

## B. Discussion

The Probation Office recommended, and the District Court imposed, the standard conditions of supervised release on both defendants. (███ PSR at 24; ███ PSR at 23; ███ A. 277, 281). The defendants challenge two of these standard conditions on appeal. Because the defendants raised no objection to these conditions at sentencing despite receiving notice of the standard conditions in their Presentence Reports, their claims are reviewed for plain error. *See Dupes*, 513 F.3d at 343 & n.2. For the reasons discussed below, both claims should be rejected.

### 1. The Challenge to Standard Condition 12 (the Risk Condition) Is Moot

Defendants first challenge standard condition 12 (the "Risk Condition"). (███ Br. 35-36; ███ Br. 5 n.1). The Risk Condition provides:

> If the probation officer determines that you pose a risk to another person (including an organization), the probation officer

> may require you to notify the person
> about the risk and you must comply with
> that instruction. The probation officer
> may contact the person and confirm that
> you have notified the person about the
> risk.

(Doe-1 A. 194; Doe-2 A. 288); *see also* U.S.S.G. § 5D1.3(c)(12). After the defendants' sentencings in this case, this Court held that the Risk Condition is "vague and affords too much discretion to the probation officer." *United States v. Boles*, 914 F.3d 95, 111 (2d Cir.), *cert. denied*, 139 S. Ct. 2659 (2019). In light of *Boles*, the Chief Judge of the Southern District of New York issued a standing order vacating and eliminating the Risk Condition in any judgment in the District. *In re Vacatur of Standard Condition of Supervision Pertaining to Third Party Risk*, No. 19 Misc. 218 (S.D.N.Y. Apr. 25, 2019) (the "Standing Order") (Add. 49). The Standing Order made clear that "any defendant who was sentenced subject to said condition is immediately and permanently relieved from said condition." (*Id.*).

Because the defendants are no longer subject to the Risk Condition, their challenge is moot. *See United States v. Johnson*, 446 F.3d 272, 276 (2d Cir. 2006) (objection to supervised release condition "became moot when th[e] condition was modified").

## 2. The District Court Did Not Abuse Its Discretion by Imposing Standard Condition 8 (the Communications Condition)

Doe-1 also challenges standard condition 8 (the "Communications Condition"). (Doe-1 Br. 36-39). The Communications Condition provides:

> You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

(Doe-1 A. 194); *see also* U.S.S.G. § 5D1.3(c)(8). Doe-1 challenges the Communications Condition on vagueness and overbreadth grounds, and he also argues that the condition interferes with his fundamental right to associate with Doe-2. These arguments have no merit, and the District Court did not plainly err in imposing the Communications Condition.

### a. The Communications Condition Is Not Vague or Overbroad

Doe-1 first argues that the Communications Condition is vague under *United States v. Kappes,* 782 F.3d 828 (7th Cir. 2015), and *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015). (Doe-1 Br. 36). But *Kappes* and *Thompson* concerned the predecessor to the Communications Condition, which provided that "the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with

any person convicted of a felony unless granted permission to do so by the probation officer." U.S.S.G. § 5D1.3(c)(9) (2015). The Seventh Circuit concluded that the predecessor condition was " 'fatally vague' because it appears to impose strict liability and does not define 'associate.' " *Kappes,* 782 F.3d at 848 (quoting *Thompson*, 777 F.3d at 376-77).[13]

The Communications Condition cures both concerns identified by the Seventh Circuit and thus is not vague. First, the Communications Condition replaces the term "associate" with the more definite phrase "communicate or interact." *See Thompson*, 777 F.3d at 377 (listing questions raised by the undefined concept of "association"). Second, unlike its strict-liability predecessor, the Communications Condition applies only if the defendant either (i) "know[s]" that the other person is engaged in criminal activity or (ii) both "know[s]" that the other person has been convicted of a felony and also "knowingly" communicates or interacts with the convicted felon. These scienter requirements alleviate any potential remaining vagueness concerns. *See Posters 'N' Things, Ltd. v. United States*,

---

[13] This Court has held that a parole condition that forbids the parolee to "associate with persons who have a criminal record" or with "persons engaged in criminal activity" is not vague. *Birzon v. King*, 469 F.2d 1241, 1242-43 (2d Cir. 1972). This Court need not address whether *Kappes* and *Thompson* are consistent with *Birzon* because, as explained below, the Communications Condition is not vague even under the Seventh Circuit's cases.

511 U.S. 513, 526 (1994) (recognizing that a scienter requirement "assists in avoiding any vagueness problem" and "mitigate[s] a law's vagueness, especially with respect to the adequacy of notice that the conduct is proscribed" (ellipses, brackets, and quotation marks omitted)). Thus, the Communications Condition incorporates revisions that the Seventh Circuit explicitly recommended in striking down its predecessor condition. *Kappes,* 782 F.3d at 849 ("A suggested modification would be to forbid the defendant 'to meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity.'" (quoting *Thompson,* 777 F.3d at 377)). Not surprisingly, the Seventh Circuit has upheld the Communications Condition precisely because it "now include[s] a scienter requirement" and "replace[s] the word 'associate' with more precise verbs," thereby "curing the kind of problems [the court] ha[s] flagged in the past." *United States v. Miller*, 641 F. App'x 563, 567 (7th Cir. 2016); *see also* U.S.S.G. App. C, amend. 803 (eff. Nov. 1, 2016) (noting that the Communications Condition was adopted in response to *Kappes).*

Doe-1 also claims that the Communications Condition is "overly broad" in that it might apply to "exchang[ing] pleasantries" with a convicted felon "bagging his groceries at the local market." (Doe-1 Br. 38). The Supreme Court long ago held that conditions prohibiting "association" with convicted felons do not apply to "incidental contacts." *Arciniega v. Freeman*, 404 U.S. 4, 4 (1971). This Court has applied the same "rule of construction" in upholding the constitutionality of other conditions. *Johnson*, 446 F.3d at 281 (supervised

release condition prohibiting contact with minors); *see also United States v. Green*, 618 F.3d 120, 123 (2d Cir. 2010) (supervised release condition prohibiting association with members of criminal street gangs); *United States v. Pabon*, 819 F.3d 26, 35 (1st Cir. 2016) ("[A]ssociational restrictions are usually read to exclude incidental encounters."). Under these precedents, the Communications Condition is likewise subject to the limiting construction excluding incidental contacts, which operates to "quiet [Doe-1's] concerns" regarding the potential overbreadth of the condition. *Johnson*, 446 F.3d at 281.

### b. The Communications Condition Does Not Violate a Constitutional Right to Association

Doe-1 next contends that the Communications Condition is invalid because it restricts his "right of association." (Doe-1 Br. 37). The Communications Condition does not violate either the First Amendment freedom of association or the due process right to intimate association.

### i. The Communications Condition Does Not Violate the First Amendment Freedom of Association

A person on supervised release is "serv[ing] part of his sentence outside of prison," and he accordingly enjoys only a "conditional," *Mont v. United States*, 139 S. Ct. 1826, 1833 (2019), or "limited" form of liberty, *Johnson v. United States*, 529 U.S. 694, 712 (2000). In light of the supervisee's reduced liberty, this Court has

called it "uncontroversial[ ]" that supervised release conditions may "deprive the convicted of substantive constitutional rights." *United States v. Carlton*, 442 F.3d 802, 810 (2d Cir. 2006) (emphasis omitted). Courts have long recognized, for example, that a supervisee's freedom to associate with criminals may be restricted because "permitting [such] 'association with hardened or veteran criminals' would defeat [the] underlying purpose[s]" of supervision. *United States v. Albanese*, 554 F.2d 543, 546 (2d Cir. 1977) (quoting *United States v. Murray*, 275 U.S. 347, 357 (1928)). The Government has "substantial interest[s] in insuring that its rehabilitative goal is not frustrated and that the public is protected from further criminal acts by the [supervisee]," and conditions prohibiting association with criminals are "reasonably and necessarily related to [those] legitimate interests." *Birzon*, 469 F.2d at 1242 n.2, 1243.

Thus, this Court held that a condition prohibiting a federal parolee's association with convicted felons and individuals engaged in criminal activity did not violate the First Amendment freedom of association. *Id.* at 1243; *see also Albanese*, 554 F.2d at 545, 547 (rejecting claim that probation condition mandating "associat[ion] only with law-abiding persons" violated probationer's First Amendment freedom of association). This Court has likewise upheld conditions prohibiting association with narrower groups of criminals, such as criminal street gang members and terrorists. *Green*, 618 F.3d at 123-24 (upholding portion of supervised release condition prohibiting association with members of criminal street gangs but invalidating portion prohibiting wearing of gang colors or insignia); *United*

*States v. Gracia*, 755 F.2d 984, 991 (2d Cir. 1985) (where defendant convicted of refusing to testify before grand jury investigating terrorist group, probation condition barring association with known or suspected terrorists "advance[d] the sentencing goals both of rehabilitation and of protecting the public"). This Court has also upheld conditions prohibiting association with groups advocating for non-compliance with the law. *United States v. Schiff*, 876 F.2d 272, 276 (2d Cir. 1989) (where defendant convicted of tax evasion, probation condition barring association with groups advocating non-compliance of tax laws was bore "a reasonable relation to his crime"). Under these precedents, the Communications Condition plainly complies with the First Amendment. *See Birzon*, 469 F.2d at 1243 (rejecting First Amendment challenge as "frivolous").

### ii. The Communications Condition Does Not Violate the Due Process Right to Intimate Association

Doe-1 also argues that the Communications Condition will "restrict[] [his] familial association" with Doe-2, an adult son with whom Doe-1 has not resided in years. (Doe-1 Br. 37).[14] However, a due process

---

[14] The defendants were remanded to custody following their arrests on August 4, 2016. Assuming they serve their full 12-year prison terms, Doe-1 and Doe-2 will be 67 and 46, respectively, when released to supervision in 2028. Doe-1 PSR at 1-2; Doe-2 PSR at 1-2). Doe-1 reports that he last lived with Doe-2 in 2012

claim "for infringement of the right to familial associations" requires proof that the government's action "was *specifically intended* to interfere with the family relationship." *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018) (emphasis added). Doe-1 cannot make that showing here. The Communications Condition is a standard condition recommended by the Sentencing Commission for all supervised release terms. *See* U.S.S.G. § 5D1.3(c)(8). It is written in generally applicable language that prohibits communication or interaction with all convicted felons or individuals engaged in criminal activity, not just those in the defendant's family. And there is nothing in the record to suggest that Judge Crotty imposed the condition with the specific intent to interfere with Doe-1's relationship with Doe-2.

Doe-1's claim also fails for the independent reason that the Communications Condition "'is narrowly tailored to serve a compelling government interest.'" *United States v. Reeves*, 591 F.3d 77, 83 (2d Cir. 2010) (quoting *United States v. Myers*, 426 F.3d 117, 126 (2d Cir. 2005)). As discussed above, this Court has long recognized the Government's compelling interests in ensuring a supervisee's rehabilitation and protecting the public from additional crimes by the supervisee. *Gracia*, 755 F.2d at 991; *Birzon*, 469 F.2d at 1243; *see also Reeves*, 591 F.3d at 83 ("[T]he government's interest in protecting a romantic partner's children is no

---

(Doe-1 PSR ¶ 65), while Doe-2 reports that he last lived with Doe-1 in 2009 (Doe-2 PSR ¶ 64).

doubt compelling."). These compelling interests are reflected in the sentencing purposes that supervised release conditions are intended to advance, including deterrence, protection of the public, and rehabilitation. U.S.S.G. § 5D1.3(b); *see also Myers*, 426 F.3d at 126 (protecting children is a "legitimate sentencing goal").

The Communications Condition is narrowly tailored to serve those compelling interests and other legitimate sentencing purposes. Successful supervision requires conditions that "structure a [supervisee's] life in such a way that the temptation to repeat the original offense and the risk that the temptation poses to society are minimized." *United States v. Tolla*, 781 F.2d 29, 34 (2d Cir. 1986). It is well established that conditions barring association with criminals are an effective means to provide that needed structure because they "prevent a convicted defendant from associating with those who would lead him back into a life of crime." *Sanitation & Recycling Industry, Inc. v. City of New York*, 107 F.3d 985, 998 (2d Cir. 1997); *see also Albanese*, 554 F.2d at 546 (recognizing that association with criminals would "defeat" the purposes of supervision). Here, by prohibiting a supervisee from communicating or interacting with those who are engaged in criminal activity or who have been convicted of felonies, the Communications Condition minimizes the risk that criminals will tempt or otherwise attempt to influence the supervisee to recidivate.

The facts of this case illustrate the reasonableness of the Communications Condition as applied to the father-son relationship between Doe-1 and Doe-2. The defendants engaged in an extended course of criminal

conduct *together*, participating for years in large-scale drug trafficking. They jointly participated in the charged narcotics conspiracies while working as confidential sources for the DEA, and thus they both concealed material facts from the DEA for years. And as the District Court found, Doe-1 falsely testified specifically about whether he communicated with Doe-2 while they were in jail. *Campo Flores*, 2017 WL 1133430, at *6. Thus, this case is far removed from *Reeves*, *Myers*, and *United States v. Jacques*, 321 F.3d 255, 266 (2d Cir. 2003), where the challenged conditions infringed on the supervisees' intimate relationships with individuals who had no involvement in the supervisees' crimes. Here, Doe-1 is complaining about infringement of his relationship with a co-conspirator in the very crimes that Doe-1 committed. But individuals with whom Doe-1 committed crimes in the past are the very people who are likely to "lead him back into a life of crime." *Sanitation & Recycling Industry*, 107 F.3d at 998. The fact that Doe-2 is Doe-1's son does not magically eliminate that recidivism risk, particularly on these facts. Therefore, there is a compelling need to mitigate the risk that Doe-1 will be tempted in the future to resume criminal activity with the very person with whom he committed crimes for years. The Communications Condition reasonably addresses that risk by preventing Doe-1 from communicating or interacting with those—convicted felons or individuals engaged in criminal activity—who are likely to provide that temptation to recidivate.

Nor does the Communications Condition improperly delegate authority to the Probation Office by al-

lowing Doe-1 to communicate or interact with a convicted felon "with the permission of the probation officer." (*See* Doe-1 Br. 38-39). This Court has held that "there is nothing wrong with" an associational probation condition that authorizes the probation officer "to specify those people with whom [the defendant] should not have contact." *Gracia*, 755 F.2d at 991. As the Court explained, "any claim of abuse of this delegated authority can be reviewed by [the district court] under" the statutory provision that "empowers the court to revoke or modify any condition of probation at any time during the probationary period." *Id.* Here, the District Court likewise has the power to "modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release." 18 U.S.C. § 3583(e)(2). If the Probation Office denies Doe-1 permission to communicate or interact with a convicted felon, his complaint "should first be brought before [the District Court], wh[ich] may then determinate whether the probation officer has abused his authority." *Gracia*, 755 F.2d at 991.

Finally, even if this Court were to conclude that imposition of the Communications Condition was an abuse of discretion, it should still affirm because any error was not plain. Doe-1 points to no controlling authority invalidating that condition (or its predecessor) on grounds of vagueness, overbreadth, interference with freedom of association, or infringement of the right of intimate association between the defendant and a family member who was a co-conspirator. Because "there is no binding precedent from the Supreme Court or this Court" supporting Doe-1's claim, *United*

*States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004), the District Court did not plainly err in imposing the Communications Condition.[15]

## POINT V

### The Court Should Reject in Part and Decline to Hear in Part Doe-2's Ineffective Assistance of Counsel Claim

Doe-2 argues that his trial counsel was constitutionally ineffective in connection with sentencing. (Doe-2 Br. 38-39). When faced with a claim of ineffective assistance of counsel on direct appeal, this Court may: "(1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the

_____

15  Doe-2 also argues, for the first time on appeal, that the District Court erred in imposing a three-year term of supervised release on Count Three, in light of U.S.S.G. § 5D1.1(c). (Doe-2 Br. 5 n.1). Doe-2 has not preserved the argument for appeal because it is relegated to a footnote. *See United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003). Moreover, any error on this issue does not amount to plain error, given that the five-year terms of supervised release imposed on Counts One and Two were statutorily mandated, 21 U.S.C. §§ 841(b)(1)(A), 960(b)(1), and were ordered to run concurrently to the supervised release term on Count Three.

record before" the Court. *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003). Ordinarily, "a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Massaro v. United States*, 538 U.S. 500, 504 (2003). Where, however, the record is sufficiently developed on direct appeal, this Court should address an ineffective assistance claim if its "resolution is beyond any doubt or to do so would be in the interest of justice." *United States v. Khedr*, 343 F.3d 96, 100 (2d Cir. 2003) (quotation marks omitted).

Here, Doe-2 argues that his trial counsel was ineffective in connection with the denial of safety-valve relief and the imposition of a fine. (Doe-2 Br. 40-41, 43). Doe-2 raises these claims for the first time on appeal, and neither the Government nor prior defense counsel has had the opportunity to address Doe-2's allegations in the District Court. Under the circumstances, these claims should be deferred for later consideration by the District Court, should Doe-2 choose to file a Section 2255 motion.

However, this Court can and should reject on direct appeal Doe-2's claim that his trial counsel's sentencing arguments were ineffective. (Doe-2 Br. 42). Doe-2 asserts that his trial counsel "did not respond to the government's contentions" regarding breach of the cooperation agreement. (*Id.*). But counsel did respond, both by joining the argument of Doe-1's counsel and providing his own. (Doe-2 A. 246-49, 254-55). Doe-2 also states that his trial counsel should have argued against "a high Guidelines range" sentence (Doe-2 Br. 42). But counsel in fact argued for a below-Guidelines sentence

(Doe-2 A. 67), and Doe-2 received a sentence far below the Guidelines. Finally, Doe-2 asserts that the purported deficiencies in trial counsel's arguments were prejudicial because the Government "did not argue that . . . its work [was] harmed by [Doe-2's] misconduct." (Doe-2 Br. 42). But the Government did argue that the defendants' breaches negatively impacted at least two cases. (Doe-2 A. 273). Because the record controverts the factual premises of this portion of Doe-2's ineffective-assistance claim, the Court should reject the claim on direct appeal.

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:      New York, New York
            August 23, 2019

                              Respectfully submitted,

                              GEOFFREY S. BERMAN,
                              *United States Attorney for the*
                              *Southern District of New York,*
                              *Attorney for the United States*
                                  *of America.*

EMIL J. BOVE III,
WON S. SHIN,
      *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,430 words in this brief.

GEOFFREY S. BERMAN,
*United States Attorney for the*
*Southern District of New York*

By: WON S. SHIN,
*Assistant United States Attorney*

**ADDENDUM**



Add. 49

# 19MISC218

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of

VACATUR OF STANDARD
CONDITION OF SUPERVISION
PERTAINING TO THIRD PARTY
RISK

_____x

Amended
Standing Order
M10-468

DOC    2

WHEREAS, prior to January 25, 2019, Condition #12 of the Standard Conditions of Supervised Release, as reflected in this Court's Judgment in a Criminal Case ("Old Standard Condition #12), read as follows:

> If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk; and

WHEREAS, on January 25, 2019, in *United States v. Boles*, __ F.3d __, 2019 WL 321022, the United States Court of Appeals for the Second Circuit held that Old Standard Condition #12 impermissibly delegated too much authority to a probation officer; and

WHEREAS, it is the intention of the Court that all persons upon whom Old Standard Condition #12 was imposed should be relieved of that condition immediately and without the need for motion practice or other judicial proceedings;

NOW THEREFORE, in the interest of the orderly administration of justice, it is hereby

ORDERED, that any and all judgments of conviction entered by this court pursuant to which Old Standard Condition #12 was imposed as a Standard Condition of Supervised Release are hereby modified by vacating and eliminating therefrom Old Standard Condition #12, and any defendant who was sentenced subject to said condition is immediately and permanently relieved from said condition; and

WHEREAS, in light of *Boles*, this court has subsequently replaced Old Standard Condition #12 with a revised Standard Condition #12 (New Standard Condition #12), which reads as follows:

> If the probation officer determines, based on your criminal record, personal history or characteristics, that you pose a risk to another person (including an organization), the probation officer, with the prior approval of the Court, may require you to notify the person about the risk and you must

comply with that instruction.  The probation officer may contact the
person and confirm that you have notified the person about the risk;

IT IS FURTHER ORDERED, that, in cases where the probation officer believes a
condition of third party risk is warranted, the probation office shall recommend to the Court that
New Special Condition #12 be imposed by the Court, and if the Court accepts the recommendation,
New Standard Condition #12 will be imposed.

SO ORDERED.

_____

Colleen McMahon
Chief Judge

Dated: New York, New York
    April 25, 2019

19MISC218

JUDGE McMAHON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

In the Matter of

    VACATUR OF STANDARD
    CONDITION OF SUPERVISION
    PERTAINING TO THIRD PARTY
    RISK

Second Amended Standing Order
M10-468

U.S. DISTRICT COURT
FILED
JUL - 1 2019
S.D. OF N.Y.

_____x

    WHEREAS, prior to January 25, 2019, Condition #12 of the Standard Conditions of Supervised Release, as reflected in this Court's Judgment and Consent Form ("Old Standard Condition #12), read as follows:

    If the probation officer determines that you pose a risk to another
    person (including an organization), the probation officer may
    require you to notify the person about the risk and you must comply
    with that instruction.  The probation officer may contact the person and
    confirm that you have notified the person about the risk; and

    WHEREAS, on January 25, 2019, in *United States v. Boles,* 914 F.3d 95, the United States Court of Appeals for the Second Circuit held that Old Standard Condition #12 impermissibly delegated too much authority to a probation officer; and

    WHEREAS, it is the intention of the Court that all persons upon whom Old Standard Condition #12 was imposed should be relieved of that condition immediately and without the need for motion practice or other judicial proceedings;

    NOW THEREFORE, in the interest of the orderly administration of justice, it is hereby

    ORDERED, that any and all judgments of conviction entered by this court pursuant to which Old Standard Condition #12 was imposed as a Standard Condition of Supervised Release are hereby modified by vacating and eliminating therefrom Old Standard Condition #12, and any defendant who was sentenced subject to said condition is immediately and permanently relieved from said condition; and

    WHEREAS, in light of *Boles*, this court has subsequently created a Special Condition, which reads as follows:

    If the probation officer determines, based on your criminal record, personal
    history or characteristics, that you pose a risk to another person (including an
    organization), the probation officer, with the prior approval of the Court,
    may require you to notify the person about the risk and you must

comply with that instruction.  The probation officer may contact the
person and confirm that you have notified the person about the risk;

IT IS FURTHER ORDERED, that, in cases in which the probation officer believes a
condition of third party risk is warranted, the probation office shall recommend to the Court that
this Special Condition be imposed by the Court, and if the Court accepts the recommendation, this
Special Condition will be imposed.

SO ORDERED.

_____
Colleen McMahon
Chief Judge

Dated: New York, New York
       July 1, 2019